No. 51.—ELIAS LONG, plaintiff in error, vs. THE STATE OF GEORGIA, defendant.

[1.] Two distinct offences cannot be joined in the same count, in an indictment.

[2.] The Penal Code of Georgia makes but one offence of robbery, and two grades of that offence, to wit: robbery by force, and robbery by intimidation.

[3.] Different grades of the same offence, may be charged in the same count; provided, in that count the offence is described in the language of the Code, or so plainly, that the Jury may easily understand the nature of the charge made; and the Jury may find the defendant guilty, generally, and in that event, the highest penalty will be inflicted; or they may find him guilty of the lowest grade; and in that event, the lesser punishment will be inflicted.

[4.] It is the duty of a private person, who is present when a felony is committed, to apprehend the felon, with a view to take him before a Magistrate; and, after a felony is committed, any private person may arrest the felon with the same view, upon reasonable and probable ground of suspicion of his guilt.

[5.] The criterion which distinguishes robbery from larceny, is the violence, actual or constructive, which precedes the taking. There can be no *robbery* without violence, and no *larceny* with it.

[6.] Threats of a prosecution constitute constructive violence, so as to make the offence robbery in only one instance, to wit: a charge of an unnatural crime, and in that case, it is the same, whether the person charged be innocent or guilty of the crime.

[7.] If, however, threats to prosecute for any other crime, are accompanied with force, actual or constructive, the offence is robbery, whether the par-

ty be guilty or not of the crime charged upon him.   The guilt of a party accused, is no defence to an act of robbery.

[8.] If one against whom a crime has been committed, with or without a warrant, arrest the offender and receive money or property without violence, actual or constructive, under an agreement not to prosecute, that is not robbery.  So, also, if a person. *bona fide*, believing that property, in the personal possession of another, belongs to him, take that property, and no more, away from him by menaces or violence, it is not robbery.

[9.] Actual *force*, in our definition of robbery, implies personal violence. If there is any injury done to the person, or if there is a struggle to retain possession of the property, before it is taken, it is the force of our Penal Code.

[10.] *Intimidation*, in our Code, is the same with "putting in fear" at Common Law, and is constructive force.  When a party is put in fear of an injury to his person or his property, or to his character, by a charge of an unnatural crime, it is robbery by intimidation.

[11.] The *taking* must be against the will of the person robbed, and if the delivery of the property seem to be voluntary, yet if from the facts and circumstances proven, it is from fear, it is still robbery.

[12.] If the transaction be attended with such circumstances of terror, such threatening, by word or gesture, as in common experience, are likely to create an apprehension of danger, and to induce a man to part with his property for the safety of his person; he is *put in fear* of his person, and it is robbery.

[13] *Actual fear* need not be strictly and precisely proven, for the law *in odium spoliatoris*, will presume fear, when there appears to be just ground for it.

[14.] Nor is it necessary that the delivery of the property be contemporaneous with the assault, if there be actual force, or with the first impressions of fear from threats or circumstances of terror ; but if the property is delivered afterwards, and whilst the fear or apprehension of danger continues, the whole is one transaction, and may be robbery.

[15.] The taking must be *animo furandi*, that is, with a purpose to steal; and the fact of robbery being proven, the *animus furandi* is inferred, from the appropriation of the property.

[16.] The Court is not bound to charge the Jury as to a principle of law, which, although a sound principle, does not grow out of the case; nor is it error to give in charge a request, in words different from those of the request, if it be clearly and substantially charged; nor is it indispensable for the Court to charge a request in immediate response to it; for it will be sufficient, if, in the course of his instructions, it is given in charge to the Jury.

[17.] Nor is he bound to charge a mixed proposition, although each part of it be true, if part is relevant to the case and part is irrelevant.

Long *vs.* The State.

[18.] It is not error for the Court to read a request, distinctly to the Jury, and to say to them. it is the law.

[19.] This Court will not undertake to prescribe the manner of intercourse between the Bench and the Bar, except when it affects the rights of parties.

[20.] Counsel have the right to correct the misrepresentations of the evidence, made by counsel in arguing to the Jury, and it is irregular for the Court to refuse to permit the correction to be made, by calling back the witness, if in Court, or by referring to the brief of the testimony required to be taken down in cases of felony.

[21.] In prosecutions for robbery, it is competent for the person robbed to prove that he was scared at the time of the robbery.

Indictment for robbery, in Gwinnett Superior Court. Tried before Judge JAMES JACKSON.    March Term, 1852.

The Grand Jury of Gwinnett County found the following bill of indictment against Elias Long and others.

GEORGIA, GWINNETT COUNTY.

The Grand Jurors sworn, chosen and selected for the County of Gwinnett, to wit, &c. in the name and behalf of the citizens of Georgia, charge and accuse Jesse F. Dishough, Williamson Cruse, Elias Long, Henry R. Swinford and Charles N. Johnson, of the County and State aforesaid, with the offence of robbery.

For, that the said Jesse F. Dishough, Williamson Cruse, Elias Long, Henry R. Swinford and Charles N. Johnson, on the ninth day of October, in the year eighteen hundred and fifty, with force and arms, in the County aforesaid, in and upon one George Braswell, in the peace of God and said State, then and there being, wrongfully, fraudulently, feloniously and violently did make an assault; and him, the said George Braswell, in great bodily fear and danger of his life, personal liberty and reputation, then and there, by force, intimidation, feloniously did put ; and one negro girl, Lucy, of the value of seven hundred dollars; one set of blacksmith tools, of the value of ten dollars; one two-horse wagon of the value of fifteen dollars; five barrels of corn, of the value of sixteen dollars, and one bill of sale for said negro girl, Lucy, of the value of seven

hundred dollars, of the goods and chattels of the said George Braswell; and from the person of the said George Braswell, by force and intimidation, wrongfully, fraudulently, feloniously, violently, and without consent of the said George Braswell, did take and carry away, with intent to steal the same, contrary to the laws of said State, the good order, peace and dignity thereof.

On this indictment, the defendant, Elias Long, was put upon his separate trial, and the following testimony was introduced for the State and the defendant, and the several points of law made and decided, as set forth.

George Braswell being sworn, said, that about the ninth day of October, in the year eighteen hundred and fifty, he was going from his house, in this County, towards the house of Jesse F. Dishough, with his wagon, having on board a pair of buggy wheels, which, according to promise, he was taking to Dishough; and when he reached the woods beyond Charles N. Johnson's house, his horses appeared frightened, and seeing something white out on one side of the road, he drove his horses out one side of the road, and got down to see what it was. About this time, some person near him, said in a loud tone of voice—don't shoot, boys, don't shoot; at the same time some person came up behind him, and clasped him tight around the waist; did not know who it was; Williamson Cruse came up and caught hold of him by the arm; the person who first caught hold of him, who he ascertained to be prisoner, Long. Long said—God damn you, I have got you, and I intend to send you to the penitentiary. Cruse said, if you attempt to escape, I will blow a ball through you. Long said, have you got any weapons? and then proceeded to examine witness, and found no weapons upon him. Witness then commenced telling them all about it; said he knew if Dishough was present, he would let him go. Long said damn you, I have got you, and I intend to send you to the penitentiary for stealing my buggy wheels. Witness again said if Dishough was there he would let me go. He promised me, if I would bring the wheels and put them in the corner of his field, he would not prosecute me. About this time, Charles N. Johnson came

up, and witness appealed to Johnson; began to tell him all about it; and said if Dishough was here all would be right. Johnson then said he would go and see Dishough, if witness wished. Johnson then left, and after being gone some little time, Johnson and Dishough came, and about the same time, Henry R. Swinford came. While Johnson was gone, Long said, God damn you, if you attempt to escape, I will kill you. I intend to send you to the penitentiary. When Dishough came back, witness appealed to him, and stated over the agreement about returning the wheels. Dishough said, boys that's right; said Long was too hard upon witness, and to let him go. Long said no, I will not; I have got him, and I intend to prosecute him. Witness then asked Dishough to beg Long for him. They then went off, and talked awhile, (Cruse having hold of him ;) when they came back, Dishough said, I cannot do anything with him; it only makes him worse. Something was then said by some of the party, about making it up. Witness asked Long if he would take fifty dollars, and make it up? Long said he would not make it up for all witness was worth, for he intended to send witness to the penitentiary. Dishough then said to witness, you had better make it up. Johnson and Long went off, and talked awhile, and came back; when witness said to Johnson, they have got me in a bad fix, and asked Johnson what he had better do? Johnson said he thought he had better pay Long something, and make it up.

Witness again asked Long what he would take and make it up? Long said he would not take a thousand dollars. Dishough and Johnson told Long he was too hard on witness. Long said he had taken his advice once in a case, and had lost three hundred dollars, and he would not settle it. Dishough persuaded Long not to prosecute, and Long swore he would, and send him to the penitentiary. After some talk, Long said, what property have you got? Witness said—some land, some stock, his wagon and horses, and some corn and fodder. Long said he did not want that; and asked witness if he did not have a negro girl? Witness said he had; but did not want to part with her, as he was a ruined man, and he wanted to take her away with him.

Long said, he did not want any of his property, and intended to prosecute him, and take him before a Justice of the Peace. After some consultation, witness offered him his negro girl. Long said he would not take her. Witness then offered the girl and his wagon; then his blacksmith tools, in addition; and then a load of corn. Long said, if you will make it five barrels, I will agree to it. Witness then agreed to it. After Dishough talked awhile, he said to Cruse and Long, who were holding witness, boys let him go; he won't run off; when they let him go; and Long said, if you attempt to run, I will kill you. Something was said about a bill of sale for the negro, and Dishough went off, and came back with a bill of sale. Witness signed it, and agreed to give up his other property before stated, and leave the country in a few days.

Long said witness must leave the country and never come back. And asked witness about the titles to his negro, and if there were any executions against them; said if there was any, and he lost the property, he would have witness if he was on land, or out of hell. Long said we had better go and get the property. Witness agreed to it. Long said, we had better go before day, as you are a ruined man, and will have to leave the country; and when it gets out, your creditors will be on you.

Long and Dishough then promised to aid him in getting off; and to get persons to come and buy him out. Dishough said he would take care of the wagon. It was then proposed to keep the whole matter a secret; to which witness agreed.

And Dishough said he would put out the tracks in the road. It was then agreed that witness, Long and Cruse, should go to witness' house after the negro. About the time they were going to start, Johnson said he would give witness a way-bill to Florida, as he had to leave the country.

Witness, Long and Cruse then went off together, on horseback, each on his own horse; witness being at liberty, went on to witness' own house; got there about day. Witness, Long and Cruse went into the yard; his wife was not up. They then went into the kitchen. Witness delivered the negro girl.

Long took her up behind him and then went off. Witness bought wheels of Bolls, all finished but boxing.

Bolls left the country before October election, 1849. Dishough and Long bought his shop, and claimed it; were in possession, after Bolls left. Witness contended he had two titles to the wheels. Bolls gave them to his wife, one time when he came over and got him to go his security. Witness could not go his security; went in to consult with his wife. Bolls said if she would let witness go his security, he would give her a pair of buggy wheels. She agreed to it. Witness then went his security on a note for $100. Got up a fuss about its being forged; and witness went over to see Bolls. Bolls agreed to settle it. Got Dishough to give him a note for $30.00; to give him a note on Todd, and the buggy wheels. Witness set the wheels aside by the bellows, in the shop. Negro girl was worth about $700; wagon was worth $15 or $20; corn was worth fifty-five cents a bushel.

*Cross-examined.*—Was over at the shop on Tuesday evening, when it was found out that Bolls had run away. Dishough, Long, old Mr. Shamble, old Mr. McGinnes and several others, were there; wheels were in the shop; witness waited till they all went to the house; took the wheels out; carried them about fifty yards into the woods, and set them up by a tree. It was about sun-down when he took them; no one was present when he took them; came early next morning, before breakfast, with a two-horse wagon, and took the wheels home; put them in his barn; covered them with fodder; kept them there secreted about a year; told Swinford he had the wheels; offered to sell them to Mr. Crowell, at the Stone Mountain. Never told any one else; witness never told Rans. B. Martin, two or three days after this transaction, about one-half mile from witness' house, that he went to the shop one night; saw Cruse and Bailiffs in the shop, with a light; waited till the light went out, and they went off, and then went and took the wheels; carried them off about one hundred yards; hid them; went home, and got his lizzard, and carried them home before day; was out in the woods a little when he was arrested by Loug; Dishough said

Long should not prosecute witness; witness signed the bill of sale ; Dishough wrote it ; did not ask Cruse to go with him and see the negro delivered; Dishough said he would fight for witness, before he should give up more than the negro girl ; did not ask Dishough to write the bill of sale ; did not go to his brother Harrison's to tell him about it ; did not tell any one about the transaction, till he saw Geo. R. Smith, at the Mountain ; did not ask Cruse to tell Bird Martin to come to his house and buy his cotton, nor anything else ; did not tell R. B. Martin, a day or two after the sale, that he had sold a negro girl to Long, and signed a bill of sale, and that he hoped Long would be pleased with her ; saw Martin that day ; Cruse was with him ; supposed Cruse had told Martin all about it.

From the beginning to the end of the transaction, none of the parties treated him ill-naturedly ; did not abuse or threaten him in any way, except to hold him, as before stated. Couch got the land ; he (witness) threatened to prosecute him, and he gave him up his deeds; Dishough, Court before last, up strairs, in the Court House, had his knife out, and said, to witness : my life for yours, if you testify anything against me ; threatened him also, in the grocery, in Lawrenceville. Witness told Musgrove, two days after the transaction, all about the difficulty, and their cheating him ; made a bill of sale to the negro to Musgrove; ante-dated it a month, so as to make it older than the one he had given to Long, so as to enable Musgrove to get the negro ; Couch got his cattle, and Bird Martin got his cotton; promised to pay him $3 per hundred for it; paid $3 for a part, and $2.50 for the balance ; never saw the negro afterward ; Cruse got part of his corn and blacksmith tools ; witness did not acknowledge the night of the difficulty, that he had stolen the wheels ; does not recollect what he told R. M. Martin, Wednesday or Thursday after the difficulty.

Witness testified, on the direct examination, that on the night of the difficulty, when Johnson came up, Long said, who is that? Johnson spoke. Long said, it is well you spoke ; if you had not, I would have shot you ; I thought it was some of Braswell's friends coming to rescue him. State's counsel asked witness

if he was not in great fear? Defendant objected. Overruled. Witness answered, he was.

William B. Brown, sworn, says : saw Cruse take off the corn, next day after the difficulty, and the smith tools; prosecutor came up, and said he wished he had left them till he had shod his horses. About the 10th October, two years ago, Dishough bought the girl from Long; witnessed bill of sale from Long to Dishough for the girl. State's counsel proposed to prove what Dishough had done with the girl; to which defendant objected—overruled by the Court—and defendant excepted.

Dishough carried off the girl about two hours afterwards, in a barouche; part of the curtains were not down; went along the public road, in the day time.

State's counsel proposed to prove that Bolls was greatly indebted; to which, defendant's counsel objected. The objection was overruled by the Court, to which defendant's counsel excepted. Bolls was a great deal in debt; thinks he was insolvent; his property was seized, after he left, by his creditors; witness went with Cruse after the corn and smith tools.

William Hazelrigs sworn, says : Mr. Long and Mr. Cruse came to the house of witness one night, to stay all night; Long said Braswell had stolen some wheels from him and Dishough; and he came in and passed as the Sheriff of Paulding; that he got a negro from Braswell, and had administered on him pretty well; got the negro to keep him (Long) from prosecuting Braswell for stealing the wheels. Cruse got the corn, and Couch the land. This was a short time after the difficulty; Long had been removed from Gwinnett County about a year; lived in Paulding County; Long kept the matter no secret.

Joseph J. Turner sworn.—Saw Mr. Long and Cruse about the time of the difficulty, coming from towards Braswell's and going towards Dishough's, about day-light, one morning. Long had a negro girl behind. It was a public road.

George Braswell re-introduced.—Long did not pay him anything for the negro and other property; did tell Robert Waters, about two weeks after the difficulty, he was not scared at the time he gave up the property; when Waters told him he ought

not to talk so; it would injure his case; he then said he was scared; went to Dishough's house late one night, to make arrangements about taking back the wheels; asked Dishough if any one was near, that could hear them talk; Dishough said no; then promised to bring the wheels, and put them over into Dishough's field; Dishough agreed if he would, he would not prosecute him; did not tell Elijah Sanders, by the side of the Court House, two Courts ago, he gave up part of the property to get the advantage of Long and Dishough; did not say to Berry Bagwell, he had got into a scrape, and wanted to leave the country, and get rid of his property; never told Berry Bagwell, at Bagwell's mother's, a few days after the difficulty, that Bolls had given his wife a set of buggy wheels, and these he took for them. The reason he covered the wheels in the fodder was, that he feared they would be taken by executions against Bolls.

C. H. Smith—Went to attach Boll's goods after he run away: our firm had debts against him; Bolls was considered insolvent.

George K. Smith—Solicitor General, proposed to prove how Braswell looked, three days after the difficulty, when Smith met him at the Mountain; objected to by defendant's counsel; overruled by the Court; and defendant excepted. Braswell came to my house, early on Friday morning, bare-footed; looked very much fatigued; looked as though he was expecting some one to come after him; was confused; looked like he was not in his right mind; thinks he has a frightened look to-day; Smith told prosecutor he ought not to run; that Long and Dishough ought to be running; and for him to go back; to which defendant's counsel excepted.

*Testimony of Defendant.*—Berry E. Bagwell — Saw prosecutor at his (witness') mother's, a few days after the difficulty; prosecutor said he had got into a bad scrape, about some buggy wheels; said Bolls had promised his wife some wheels; Bolls had some buggy wheels finished in his shop; and he took these in place of them.

Rans. B. Martin—Braswell told witness, about half a mile from prosecutor's house, two or three days after the difficulty,

that the night he took out the wheels, he saw Cruse and the bailiffs in the shop with a light; waited till the light went out and they went off; then went to the shop; took out the wheels; carried them off about one hundred yards into the woods; went home and got his lizzard, and took home the wheels on the lizzard, before day; hid them in his barn, under the fodder; and kept them about a year.

Witness went to Braswell's house, morning after the difficulty; Cruse and Swinford and Mrs. Braswell were there measuring corn; Braswell was not there; started back to find him; Cruse went with him; met him about half a mile from the house; Braswell asked Cruse how Long was pleased with his negro; Cruse said very well; prosecutor said he hoped he would be pleased with her; heard nothing of any robbery, or any complaint; did not hear the bargain about the corn; thinks prosecutor made the offer to sell; prosecutor said he gave two hundred dollars for his land;. asked witness three hundred and fifty for it; witness bought his cotton; gave him three dollars per hundred for part and two dollars and fifty cents for part—that being damaged; Cruse bought his corn; did not speak of Long's getting the negro as a difficulty; said he had done wrong in taking the wheels, and was sorry for it; witness had no interest or connexion with the scrape about the negro; got no part of prosecutor's property that he did not pay him for; never heard anything of his being a person sent to buy prosecutor's property until to-day.

Did not take out proceedings against Dishough and Long's property, bought of Bolls, because he thought they had a good title to it; thinks he did not tell Charles Smith and Oliver Strickland, that it was a fraudulent concern.

Elijah Sanders—Saw prosecutor near the Court House door, two Courts ago; said he had a case in Court against Dishough, Long and Cruse; asked him how it got up; he said it got up about some buggy wheels; that he had given up part of his property to get the advantage of them.

Charles N. Johnson—Was present when this prosecution commenced; was recognized as a witness, on the part of the

State; when he came to Court, he was told, by the Solicitor General, that his testimony went to clear others, and unless he could swear differently, he must put him in the bill of indictment, and he must run his chances with the rest; recollects the night of the difficulty; late at night, about 12 or 1 o'clock, heard a rattling of a wagon; got up and went out; saw a man passing by, with a two-horse wagon; went back in the house, and kindled a light; heard talking down at the end of the lane, three or four hundred yards from witness' house; got up and went out; went down there; when he got near, Long said to him—who's that? witness answered; Long said it's well you spoke, or I would have shot you, for I thought you were some of Braswell's friends, coming to rescue him; Braswell then commenced telling the witness about the difficulty; when he first went up, Braswell was offering Long fifty dollars to settle it; said he had brought them wheels, and that Dishough had promised not to prosecute him; Long insisted upon carrying him before a Justice of the Peace; said he would prosecute him, and carry him before Esquire Brooks; refused to settle it; prosecutor said he wanted to settle it; proposed to witness to talk to Long, and beg for him; told prosecutor he had no influence with Long; that they had had a difficulty; witness told Long not to be so hard with him; Braswell then said Dishough had agreed to settle the matter, if he would bring the wheels; witness proposed to go for Dishough, if it would be any satisfaction; and he requested witness to go; witness went to Dishough's house and hailed; Dishough came out, and went with witness to them; prosecutor began to tell the difficulty, and Dishough said that was right, and told Long he ought not to prosecute him; Long said he would, and intended to send him to the penitentiary; Dishough then went off with Long and talked awhile, and came back, and said he could do nothing with him, and said they had better make it up; prosecutor then asked Long what he would take; Long said he would not settle it for all prosecutor was worth: he intended to send him to the penitentiary; prosecutor proposed to Long to give him some of his property; Long said he didn't want his property; after talking

for some time, Long said to prosecutor, he wouldn't settle it; prosecutor and Long went off and talked awhile, and when they came back, prosecutor was offering him his negro girl, which Long refused to take; he then offered his wagon in addition, and his blacksmith tools, and then a load of corn also; Long said, if you will make it five barrels, I will take it; Dishough said he would fight for prosecutor, before he should give any more than the negro; prosecutor and Long then agreed to settle it; and all appeared consentive and friendly; prosecutor proposed to Dishough to write the bill of sale; prosecutor said he wanted all done that night; at his request, Dishough went and got pen, ink and paper, and wrote the bill of sale; prosecutor did not want his wife to know that he had sold the negro girl; he was afraid for it to get out; if it was put off till day, he would be prosecuted; Long and Cruse went with him; Cruse went at the request of prosecutor to see the negro delivered; about the time they were going to start, prosecutor said he had to leave the country, and wanted witness to give him a way-bill to Florida; witness said he would do so at any time he wished; Braswell requested that the whole matter should be kept a secret; was the first one who proposed it should be kept a secret; Long and Cruse had let him go before Long accepted his proposition; and all were standing about together; the wagon was about eight yards out of the road; Dishough said he would put out the tracks and take care of the wagon, at the request of prosecutor; no one offered prosecutor any violence; heard no talk of weapons; heard no threats of violence by anybody, except that Long said if prosecutor attempted to escape he would shoot him; prosecutor at first said he took the wheels home before breakfast; Long was not satisfied with this; he then said he took them home before day; Dishough, Long and Cruse were at witness' house till 10 o'clock on the night of the difficulty; don't recollect whether Braswell was scared much or not; does not recollect that they made prosecutor promise not to come back; has no recollection of hearing Long say, he would have him, if he was out of hell; Dishough carried the girl off along the public road in a barouche,

in the day-time, curtains not down; Wells was with Dishough when he carried off the negro; don't think Wells lived with Dishough at that time; at the time of the difficulty, Braswell asked witness what he thought he ought to do; witness said he thought he ought to settle it, if he could, for a small sum; but told Long he thought he was asking too much; witness told prosecutor he had no influence with Long, because he had had a difficulty with him; the parties did not talk loud at the time of the difficulty; it was in a common conversational tone.

*By the State*—D. H. Walker sworn, says: had a conversation with Johnson, before filing the bill of indictment, about the facts of the case; told Johnson if that was all he could swear, he would have to put him in the bill of indictment, and he must take his chances with the others; did not insert his name in the bill originally, but did so after the Grand Jury had heard the testimony, at their request.

Samuel F. Alexander sworn, says: he was one of the Grand Jury that found the bill; after the Jury had heard the testimony, the Jury instructed the Solicitor General to insert the name of Johnson, in the bill.

N. L. Hutchins sworn, says: he was of original counsel for the prosecution; had a talk with Johnson about the difficulty; after a consultation with Solicitor General, determined not to put Johnson in the bill; it was done at the request of the Grand Jury.

Here the evidence closed. Counsel for defendant requested the Court to charge the Jury as follows:

1. That to constitute the crime of robbery, the property must have been taken wrongfully, fraudulently and violently, or by intimidation, without the consent of the owner.

2. That to constitute the crime of robbery, by force, the State must show that some actual force was used by defendant, in taking the goods.

3. That to constitute the crime of robbery, by intimidation, the person robbed must be put in fear of some personal or bodily violence or injury, or in fear, by a threat, of charging the prosecutor with an unnatural crime.

4. That if the charge has been made, and the property given up, on consideration not to prosecute the party further, that will not amount to robbery, by putting the party in fear of a charge of an unnatural crime.

5. That if the prosecutor was guilty of stealing the property of prisoner, and he caught him with it in possession, he (the prisoner) had the right to way-lay, and arrest, and secure him, and take him before a Magistrate; and if, after the arrest, the prosecutor agreed to give up the property, to settle the case, and stop the prosecution, and in accordance with such agreement, gave up the property, it will not be robbery in prisoner.

6. That whether the taking was either by force or intimidation, it must be with intent to steal the same.

7. That to maintain this indictment, the State must prove a larceny, and prove it to have been committed under the circumstances which, together with it, constitute the offence of robbery.

8. That if the Jury believe, from the evidence, that the defendant did not intend to steal the property, then it is not robbery.

9. That the bill of sale, if procured by force, is of no value, and, therefore, signing that did not constitute robbery; that the violence or force must exist and operate at the time the property is taken by the prisoner.

10. The property must be taken, *animo furandi*, as in other cases of larceny.

11. That if the Jury believes, from the evidence, that the property was given up on the promise to stop the prosecution, and not from fear of bodily harm, then it is not robbery.

12. That if the Jury have any reasonable doubts of the existence of any fact necessary to constitute the crime of robbery, they must give the prisoner the benefit of such doubts, and acquit.

*Charge of the Court.*—That in this, as in all other criminal cases, they were judges both of the law and of the facts; yet it is the duty of the Court to give them his views of the law governing the case; by which views, whilst they should respect them, they

would not be absolutely controlled, but would judge the law for themselves ; that growing out of this duty of the Court to charge the law, was the right of defendant's counsel to request of him to charge the Jury upon specific points, and in a particular way. In accordance with this right, defendant's counsel had requested the Court to charge: First—The Court then read directly to the Jury, the first charge requested, and said to them, it is the law. Second—The Court charged in the same way. Third—The Court charged in the same manner the first clause of this number, but said to the Jury as to the latter, that there was no charge in this case, of an unnatural crime, and hence that had nothing to do with the case. Fourth—This related also to unnatural crime, and the Court did not charge it. Fifth—The Court declined to charge the Jury, as requested under this head, stating to the Jury as his reason, that he recollected no testimony in reference to the prosecutor being taken before a Magistrate. Sixth—The Court, after reading it to the Jury, charged it to be the law. Seventh—Under this head, the Court charged that the distinction between lacreny and robbery was this : in the first, the property is taken privately and without the knowledge of the owner; in the other, forcibly with his knowledge, but against his will ; in other respects the two offences agreed. Eighth—On this head, the Court thought the broad language used, calculated to mislead the Jury as to the law, and said to them, that in this case, the other ingredients constituting robbery, being proven to their satisfaction, if they were satisfied as to them, the intention to steal would be manifested by the appropriation of the goods to the use of the defendant; his taking and carrying them off as his own. Ninth—Under this head, the Court charged, after reading it to the Jury, that it was the law; but that if they believed that this bill of sale was extorted by force or intimidation at the time it was signed, and afterwards, the same night, though 4 or 5 miles distant, the force or intimidation still continuing, and the prosecutor still operated upon by it, gave up the negro ; all taken together, it amounted to one transaction, and was robbery. Tenth—The Court charged, as requested,

but said to the Jury, that in this case, the other ingredients upon which the Court would charge them presently, being proven to their satisfaction, the *animus furandi*, in this case, would be manifested by taking off the goods, and appropriating them as defendant's property.   Eleventh—The Court read it to the Jury, and charged as requested.   Twelfth—The Court read it to the Jury, and charged as requested.

After charging the foregoing upon the points requested by defendant's counsel, the Court said to the Jury, to apply these principles of law to this case: if you believe, from the testimony, that the prosecutor gave up his property, solely from the fear of a criminal prosecution and its consequences, it amounts, in law, to extortion by duress, or at farthest, compounding a felony, and the defendant, in this case, is not guilty of robbery ; but if you believe, from the testimony, that the defendant, Long, together with Dishough and others, knowing that the prosecutor had taken the buggy wheels—whether he stole them or not, in the judgment of the Court is immaterial—entered into a conspiracy to plunder him of his property, and in pursuance of such conspiracy, instead of taking out a warrant against him, induced him, in the dead hour of the night, to return the wheels to a particular place, and there lay in wait for him, and rush out upon him with cries of don't shoot, boys, and threats to shoot ; seize him and hold him, and extort from him, through fear of personal violence, terror and alarm, produced by the surrounding circumstances united, and in addition to the threats to prosecute and send him to the penitentiary, take his wagon and the bill of sale on the ground, and the negro, the same night, the defendant, Long and another, still accompanying him for the purpose, and run off the negro the next day to parts unknown—the defendant is guilty of robbery, and it is the duty of the Jury so to find him.

The above is the substance of the charge to the Jury.

To which charges and refusals to charge, defendant's counsel excepted.

The Jury returned a verdict of guilty. Whereupon, the defen-

dant's counsel moved in arrest of the judgment, and for a new trial, upon the following grounds, to wit:

THE STATE,  } *Robbery, in Gwinnett Superior Court.*
    *vs.*  }         *Verdict—Guilty.*
ELIAS LONG.  }

And now comes the defendant by his attorneys, and moves in arrest of judgment in the above case, upon the following ground:

1. Because the indictment charges two separate and distinct offences in one count, to wit: *Robbery by force,* and *robbery by intimidation.*

On motion of counsel for defendant, it is ordered that the Solicitor General show cause *instanter,* why the verdict in the above case should not be set aside, and a new trial ordered, upon the following grounds, to wit:

1. Because the Court erred in permitting the prosecutor to state that he gave up his property through fear.

2. Because the Court erred in permitting the prosecutor to state why he returned, when he had left home with the intention of quitting the country; and also the conversation with George K. Smith, at the Stone Mountain.

3. Because the Court erred in permitting George K. Smith to state his directions to prosecutor at the Stone Mountain, and to testify as to what was the appearance of prosecutor at the time.

4. Because the Court refused to require the Solicitor General to read the authorities upon which he relied, or to furnish them to defendant's counsel before the opening of the argument to the Jury; but stated that the authorities should be furnished before the argument of the concluding counsel for the defendant, and read, if counsel desired to consume another hour of the time of the Court.

5. Because the Court erred in refusing to charge the Jury as requested, in the fifth ground taken by defendant's counsel; but on the contrary, said he recollected no evidence that the prisoner offered to take prosecutor before a Magistrate.

6. Because the Court erred in charging the Jury, that if four

or five men get together, and way-lay a man, even who has stolen property in his possession, and by putting him in fear, obtain property from him, intending to appropriate the same to their own use, it is robbery.

7. Because the Court erred in charging the Jury, that if the defendant in this case, received the property with an intention wrongfully to appropriate the same to his own use, it was robbery.

8. Because the Court erred in refusing to charge the law in the language requested by defendant's counsel.

9. Because the Court erred in charging on the tenth ground, as requested by counsel, that the property must be taken *animo furandi*, as in other cases of larceny; said that that was true, but if the defendant in this case took the property with an intention to appropriate the same to his own use, it was robbery.

10. Because the Jury found contrary to the evidence.

11. Because the Jury found contrary to law.

Counsel for the defendant then asked for a short time to be heard upon the several grounds in arrest of judgment, and for a new trial before the Court, by argument and the production of authorities, which the Court refused, and said the grounds were overruled, and any other which you may see proper to put; the defendant's counsel have their remedy.   To which defendant's counsel then and there excepted.

During the argument of concluding counsel for the State, he went on to say that Johnson did not state in his testimony that he went to Dishough's house on the night of the difficulty, and hailed; but that he went after him; but there was no proof of his going to Dishough's house, and that he went after him, but found him secreted in the woods, near the place.   Prisoner's counsel called State's attorney to order, and said Johnson *did swear* he went to Dishough's house, and appealed to the Judge's notes and the witness who was in Court, for proof of his correctness. The Court said his notes were a mere private memorandum that he was required to keep, and ordered defendant's counsel to take his seat; that the Jury would decide; to which defendant excepted.

And the counsel for the defendant, on this nineteenth day of March, 1852, being within thirty days from the adjournment of said Court at said Term, tenders his bill of exceptions, and says:

*First.*—That the Court erred in admitting the prosecutor to answer the question, " whether he was not in great fear ?"

*Second.*—That the Court erred in admitting testimony to show what Dishough did with the negro girl.

*Third.*—That the Court erred in admitting evidence as to Bolls' indebtedness.

*Fourth.*—That the Court erred in allowing George K. Smith to describe the appearance of prosecutor, three days after the difficulty ; and to state also his directions to prosecutor.

*Fifth.*—That the Court erred in saying before the Jury, when defendant's counsel asked to be furnished with the authorities intended to be relied upon by the prosecution, before the argument to the Jury commenced, " You shall be furnished with them before your concluding counsel commences his argument, and they shall be read too, if you desire to consume another hour of the time of the Court."

*Sixth.*—That the Court erred, when the concluding counsel on the part of the State was misrepresenting the evidence to the Jury in a material point, in refusing to permit defendant's counsel to correct him or to permit it to be done by reference to the testimony, as taken down by the Court, or by calling upon the witness, who was present in Court.

*Seventh.*—That the Court erred in refusing to charge the Jury as requested by defendant's counsel, under the 3d, 4th, 5th, 7th, 8th, 9th, and 10th heads.

*Eighth.*—That the Court erred in merely reading to the Jury, the charges under the 1st, 2d, 6th, 11th, and 12th heads, as prepared by defendant's counsel, and saying to them, " it is the law;" but without explanation or application of those general principles to the case at bar.

*Ninth.*—That the Court erred in charging the Jury, under the ninth head, " that if they believed that this bill of sale was extorted by *force* or intimidation at the time it was signed, and afterwards, the same night, though four or five miles distant, the

force or intimidation still continuing and the prosecutor still operated upon by it, gave up the negro; all taken together it amounted to one transaction, and was robbery;" there being no evidence in the case, upon which to base such charge.

*Tenth.*—That the Court erred in charging the Jury, under the tenth head, in assuming that the ingredients from which the *animo furandi* would be presumed, had been proven in this case.

*Eleventh.*—That the Court erred in the conclusion of charge to the Jury, by saying to them, that if they believed from the testimony, an assumed state of facts, to some of which there was no proof, and especially of unqualified " threats to shoot," and upon others, it being contradictory, that " the defendant is guilty of robbery, and it is the duty of the Jury so to find him."

*Twelfth.*—That the Court erred in refusing to arrest the judgment, upon the ground taken above.

*Thirteenth.*—That the Court erred in refusing to grant a new trial, upon each of the grounds stated above.

*Fourteenth.*—That the Court erred in refusing to hear argument or authority from defendant's counsel, in support of their motion in arrest of judgment, or for a new trial.

*Fifteenth.*—That the Court erred in refusing to grant a new trial, upon the grounds that the finding of the Jury was contrary to law and contrary to the evidence.

On which several rulings and decisions of the Court, the defendant took his bill of exceptions.

SIMMONS, C. PEEPLES and DOUGHERTY, for plaintiff in error.

· W. J. PEEPLES, Solicitor General, represented by HULL, for defendant.

*By the Court.*—NISBET, J. delivering the opinion.

[1.] The motion to arrest the judgment, first demands attention, in the consideration of this cause. The ground of the motion, is that the indictment charges two separate and distinct offences in one and the same *count*, to wit: robbery *by force*,

VOL. XII 40

and robbery *by intimidation.* It contains but one count, and in that the defendants are thus charged : " For that the said Jesse T. Dishough and others, (naming them,) on the ninth day of October, 1850, with force and arms, in the County aforesaid, in and upon one George Braswell, in the peace of God and said State, then and there being, wrongfully, fraudulently, felonious-ly, and violently, did make an assault, and him the said George Braswell, in great bodily fear and danger of his life, personal liberty and reputation, then and there by force and intimidation, did feloniously put, and one negro girl, named Lucy, of the value of seven hundred dollars ; one set of blacksmith's tools, of the value of ten dollars ; one two-horse wagon, of the value of fifteen dollars ; and five barrels of corn, of the value of sixteen dollars ; and one bill of sale of the said negro girl, Lu-cy, of the value of seven hundred dollars ; of the goods and chattels of the said George Braswell, and from the person of said George Braswell, by force and intimidation, wrongfully, fraudulently, feloniously and violently, and without the consent of the said George Braswell, did take and carry away, with in-tent to steal the same," &c.

[2.] There can be no doubt but that it was the purpose of the pleader to charge the defendants in this count, with *robbery* by *force*, and also by *intimidation.* The objection is, that our Penal Code makes two separate offences, to wit : *robbery by force*, and *robbery by intimidation* ; and that these two offences being charged in one count, the indictment on that account, is fatally bad ; and if so, no judgment can be pronounced upon it. If the Code creates the two offences, as claimed, then the judg-ment ought to be arrested ; because there is no doubt of the rule that two distinct offences cannot be joined in the same count. Does the *Code* make two offences ? We think not ; but creates one offence, to wit : *robbery*, and makes two grades of that offence. One, robbery by *force*, which is the highest grade, and punishable with the longest term of imprisonment, in the penitentiary ; and the other, robbery by *intimidation*, which is the lower grade, and punished with a shorter term of imprisonment. It defines robbery thus : " robbery is the wrongful, fraudulent

Long *vs.* The State.

and violent taking of money, goods, or chattels, from the person of another, by force or intimidation, without the consent of the owner." *Prince*, 678. The offence is single; and it is robbery, if committed by *force*, and not the less robbery when perpetrated by *intimidation*. *Force* is the ruling element in the offence. When the Code speaks of *force*, it means *actual* violence; and when it speaks of intimidation, it still means force; not actual and direct, but exerted upon the person robbed, by operating upon his fears—the fear of injury to his person, or property, or character. The law considers, however, that actual violence is attended with more immediate and serious consequences than violence by intimidation; and therefore it is, that a distinction is made in the punishment. The former constitutes *the offence* with greater enormity. The offence, I conclude, is single, for the reason stated, that the element of *force* is necessary to constitute it in either case. It was so considered at *Common Law*. The Common Law definition of *robbery*, does not vary in substance from that of our *Code*, and it is exactly the same in reference to the alternative character of the offence. *Robbery*, by the *Common Law*, is "a felonious taking of money or goods of any value from the person of another, or in his presence, against his will, by violence, or putting him in fear." *2 East. P. of the C. ch. 16, §124, p.* 707. *4 Block. C.* 243. *1 Russell on Crimes,* 867. The alternative mode of committing the offence is violence *or* putting in fear. These words are synonimous with *force* or *intimidation* in the *Code*. At Common Law, it is held that if property is taken by *either* of these means, against the will of the party, such taking will be robbery. At Common Law, therefore, there was but one offence, and *fear* was held to be *constructive* violence. *2 East. P. C. ch.* 16, §127. *Fost.* 128. *Donnally's Case,* 1 *Leach*, 196, 197. *Keane's Case,* 2 *Leach*, 619. *1 Russell on Crimes,* 874.

In the particular in which I am now regarding *robbery*, that is, in reference to the singleness of the offence, I do not doubt but that the *Code* is declaratory of the Common Law, and its true meaning is legitimately ascertained by resort to the Common Law. The prescription of two punishments does not necessa-

rily imply two offences. A sufficient reason for that, is found in the greater and less enormity of the offence, when committed in the one way or the other. Nor is it uncommon at Common Law, or under our Code, to find different grades of one and the same offence. Upon this idea that there was but one offence, an indictment at Common Law, which contained the alternative modes of committing *robbery* by violence, and by putting in fear, in different counts, was a good indictment. We have held that different grades of the same offence may be charged in the same indictment, in separate counts, and that upon such an indictment it is competent for the Jury to find the defendant guilty of the higher or the lower grade, and that the Court will inflict the punishment according to the finding; and farther that a general verdict of guilty carries with it punishment for the highest grade; and punishment for the lower grade will be inflicted only, where they find the defendant guilty of that grade expressly. 10 *Geo. R.* 47. 11 *Geo. R.* 92.

[3.] It remains to inquire whether different grades of the same offence can be charged in the same count. At Common Law, we are free to admit, that it cannot be done. Under our Statute, we think it can be done. Under our Statute, an indictment is good, which charges the offence in the language of the Code, or so plainly that the Jury may easily understand the nature of the offence. We say, as we have before said, that if an offence is described as this Act requires it to be done, it is as to the description, a good indictment, no matter what it wants, when judged by the Common Law rules of pleading. For this, but a single reason need be given, and that is, that the Legislature has said, in so many words, that it shall be sufficient. We do not believe that the Legislature meant to say, that if the rules of the Common Law are complied with, as to *forms* of pleading, then a description of the offence, as they have laid it down, will be sufficient. They meant clearly to dispense with and repeal the forms of the Common Law, in the descriptions of offences, and to make *sufficient* any indictment, irrespective of counts or other formalities, which charges the offence in either of the modes which they have prescribed. If an indictment is good,

which charges different grades of an offence in separate counts, then it may be well put to reason or to professional learning, why is it not good when the different grades are charged in one and the same count, when in that one count, they are as distinctly charged as they are or could be in separate counts? We hold then, that different grades of the same offence may be charged in one count, provided in that count, the offence is described in the language of the Code, or so plainly that the Jury may easily understand the nature of the offence. If this is not done, the pleading is bad. Where the offence, as in this case, may be committed in more ways than one, the judgment must set forth the different modes. That is plainly done in this indictment. The offence is charged in the language of the Code, and it is charged to have been done by force and by intimidation, so plainly that it would seem to be impossible for the Jury not to understand the nature of it. They cannot be presumed to be in any difficulty about applying the testimony; the more especially, as it is the duty of the Court (which duty it is presumed he will discharge,) to instruct them as to their right to find the one grade or the other, and as to the form of their verdict. Nor has the defendant any cause to complain, that he is not notified of the crime which he is to defend against. He is charged with the one offence, to wit, robbery; and he is charged with committing it in both the modes in which it may be committed. He must at his peril, be prepared to meet the offence, whether committed in the one way or the other. The argument relied upon mainly to overthrow all this reasoning, is that the finding of the Jury being general, the Court will not know of what grade the defendant is guilty; and therefore, cannot make any discrimination in the punishment. To which I reply: If the finding is general, he is guilty of the highest grade charged in the indictment. The law will apply the verdict to that part of the indictment which charges the offence in the mode to which the highest penalty attaches. Upon that he will be sentenced—upon that the judgment will be based. If found guilty of the lower grade, then the verdict applies to that part of the indictment which is descriptive of that

grade of the offence, and the judgment will go accordingly. So a criterion for determining the punishment, will be always found in the verdict. And we do not doubt but that the record of the judgment and of the pleadings, will be a complete protection of the party. The verdict in this case was general, and the term of imprisonment to which the defendant was sentenced, was within the term prescribed for the highest grade of the offence. For these reasons, we do not believe that there was error in denying the motion of the defendant to arrest the judgment.

[4.] Before considering the points further made in this record specifically, I remark that it is not only the right, but it is the duty of any private person present when a felony is committed, to apprehend the felon ; and when a felony has been committed, any private person acting upon a reasonable and probable ground of suspicion, may also apprehend the person suspected of the crime. The apprehension, under these circumstances, may be made without a warrant, but it is only for the purpose of taking the offender before a Magistrate. He may be taken and detained, until he can be committed to the custody of the law. The arrest is for no other purpose. And when made upon actual knowledge and observation of the commission of the crime, it is not only an act which the law allows, but one which it regards with favor. 2 *Hawk. P. C.* 74. 2 *Hale's P. C.* 77. *Cald.* 291. 4 *Taunt. R.* 34-5. *Price's R.* 525. 4 *Black. Com.* 293, *n* 16. 11 *Johns. R.* 486.

[5.] It is important also, to refer to the distinction between *larceny* and *robbery.* Whilst *robbery* is a species of *larceny,* and whilst felonious taking is an element common to both, yet the two offences are widely different. The criterion which distinguishes *robbery* from *larceny,* is the violence which precedes the taking. There can be no *robbery* without violence, and there can be no *larceny* with it. I do not, in this connection, limit violence to actual force, but mean violence, actual or constructive. It is violence that makes the former an offence of greater atrocity than the latter. *Qui vi rapuit, fur improbior esse videtur.* 4 *Black. Com.* 242.

[6.] Again, threats of a prosecution amount to that violence

by construction, which constitues the offence of robbery, only in one instance, and that is when the threat is to prosecute for an unnatural crime; and it will be *robbery*, whether the party is guilty or not. So abominable is the crime, and so destructive is even the accusation of it, of all social right and privilege, that the law considers that the accusation is a coercion which men cannot resist. This seems to be the only case in which a threat to prosecute, will supply the place of actual force. 2 *Leach*, 730. 1 *Ibid*, 139. 2 *Russ.* 1009. 1 *Car. and P.* 79. 1 *Russ. on Crimes*, 5 *Amer. edit.* 884.

So that threats to take one before a Magistrate, or to prosecute for any other offence, or accusations of other crimes, although these may have the effect of extorting money or property from a person, do not make the transaction a *robbery*.

[7.] If, however, such threats or accusations are accompanied with force, actual or constructive, and the property or money is given up in consequence of this force, the transaction is robbery. Nor is the guilt of the party accused, any defence to an act of *robbery*. If property is extorted by violence, upon a charge of *larceny*, or any other crime, the offence is neither justified nor mitigated by his guilt, nor aggravated by his innocence. The law will not permit property or money to be violently taken from a citizen, because he happens to be a guilty man. He is liable to the law if guilty, and under the protection of the law, whether innocent or guilty.

[8.] We have seen already, that any one may arrest a person suspected of a crime, with a view to take him before a Magistrate, and to have him legally brought to trial. In such case, his guilt or innocence may be a very material matter with the person arresting him. He is interested at least, to show reasonable and probable cause to suspect his guilt. That, however, is a different affair from robbery. So also, a person against whom a crime has been committed, may receive money or property under an agreement not to prosecute, either with or without an arrest and without violence. This is not to be confounded with robbery; it is compounding a felony, when the offence is of the grade of felony. It is certainly proper, in

determining whether this defendant, under the evidence, is guilty of robbery or not, to look to all these things ; but what I mean to say is, that if the property in this case was extorted by violence, if such is the proof, then the offence cannot be false imprisonment, or compounding a felony, or any other offence but robbery, and that whether Braswell stole the buggy wheels or not. It is true, too, that if a party, *bona fide* believing that property in the personal possession of another belongs to him, *take that property*, and none other, away from him, with menaces and violence, it is not robbery, and it will be for the Jury to say whether the party acted under such *bona fide* belief. So, if in this case, the defendant *bona fide* believing that the buggy wheels in the personal possession of Braswell belonged to him, had taken them alone by threats and violence, he would not have been guilty of robbery. *Russell on Crimes*, 1 *vol.* 871, 872. 3 *C. and P.* 400. He did not take the buggy wheels, but other and far more valuable property; so that a question of this sort does not arise.

[9.] We have seen that by our Penal Code, robbery is committed by *force or intimidation.* Force implies actual personal violence, a struggle and a personal outrage. If there is any injury done to the person, or if there is any struggle by the party to keep possession of the property before it is taken from him, there will be sufficient force or actual violence to constitute robbery. This is a matter so easily understood, that I must dwell no longer upon it. 3 *Chitty, C. L.* 804-5. 1 *Leach,* 335. *Ibid,* 320. 2 *East. P. C.* 709. 1 *Russell on Crimes,* 875, 876, *margin.*

[10.] *Intimidation,* as I have before stated, is constructive *force.* As *force* in our definition, is the same with the *violence* of the Common Law definition, so *intimidation* in ours, is synonimous *with putting in fear* in the Common Law definition. *Putting in fear,* is the meaning of *intimidation.* To intimidate is to make fearful—to inspire with fear. The construction, therefore, which the British Courts have put upon *putting in fear,* is just that construction which is due in our Courts to intimidation. Robbery may be committed, by putting one in fear of injury to

Long *vs.* The State.

the person, to property or to character.   In relation to all cases of robbery by intimidation, it is held, that where property is extorted by fear, it is robbery, although it be taken under color of a gift.

[11.] The *taking* must be against the will of the person robbed, yet it may seem to be with his consent, when it is really delivered from fear.  If it is apparently voluntary, yet from the facts and circumstances it is from fear, it is still robbery.  Thus, if a man with or without a drawn sword or other offensive weapon, but with such circumstances of terror as indicate a felonious intention, ask an alms of one who gives it to him through mistrust and apprehension of violence, it will be robbery.  So, in this case, although the executing of the bill of sale, and the delivery of the wagon, &c. may seem to have been the voluntary acts of Braswell, yet if done under such circumstances of terror as indicate a felonious intent, it will be robbery, and the Jury are to judge of the facts and circumstances of terror.  1 *Russell on Crimes*, 871, 879.  2 *East. P. C.* 711.  4 *Black. Com.* 244. What, we inquire, is intimidation ?  I have already remarked upon fear of injury to character with sufficient fullness for the necessities of this case.   The evidence does not indicate any threats of injury to the property of the prosecutor, and it is not necessary, therefore, to discuss that division of the subject.  Fear of injury to the person is the ground of violence now to be noticed, and this is the point upon which the case mainly hinges. As to the *amount* of this fear.   Where property is obtained by this means, it will be robbery, although there be no great degree of terror or affright in the party robbed.

[12.] The rule is this : *if the fact be attended with such circumstances of terror—such threatening by word or gesture, as in common experience, are likely to create an apprehension of danger, and induce a man to part with his property for the safety of his person; it is a case of robbery.*  *Fost.* 128.  4 *Black. Com.* 243. 1 *Hawk. P. C.* 96.  1 *Leach*, 280.  3 *Chitty's C. L.* 803.  1 *Russell on Crimes*, 879.

[13.] Nor is it necessary that actual fear should be strictly and precisely proved, for the law *in odium spoliatoris*, will presume

fear where there appears to be just ground for it. *Fost.* 128. 2 *East. P. C,* 711. 1 *Russ. on Crime,* 879. What are circumstances of terror, cannot be with certainty stated. They are of course various. The rule laid down, gives the safest criterion for their ascertainment, that is, the circumstances of terror are such as in *common experience* are likely to create apprehension of danger. If, according to common experience, the apprehension of danger, growing out of the circumstances, is so great as to constrain a man to part with his property for the safety of his person, then they are sufficient to make the taking violent, and a robbery. The place, the time, and the number of the assailants, are to be considered—as a retired place, at night, and a number so great as to make the idea of resistance impracticable. To these may be added uproar, and shouts, and disguise, and the presence of offensive weapons. See the case of robbery on Gadshill. 3 *Shakespear,* 462 *to* 465. Threats by word or gestures are of themselves sufficient to imply violence, and are the most usual means of intimidation.

[14.] Nor is it indispensable that the delivery of the property be contemporaneous with the assault, if there be force, or with the first impression of fear from threats or circumstances of terror; but if the property is delivered afterwards, and whilst the fear or apprehension of danger continues—or if the circumstances of terror or the threats are continuous up to the delivery—the whole is one transaction, and may be robbery. In such case, it is a taking, *in law,* and is as much without consent as if the taking was immediate. So it has been held, that if thieves attack a man to rob him, and finding little or nothing about him, force him by menace of death to swear to fetch them money, which he accordingly does, and delivers it to them whilst the fear of the menace continues, it is a felonious taking, and a robbery. 1 *Russell,* 871. 3 *Inst.* 68. 1 *Hale,* 532. 2 *East P. C.* 714.

So in this case, if the fear, from the circumstances of terror and threats, continued from the first assault upon Braswell up to the delivery of the property to Long, of which the Jury are to judge, the taking was felonious, and the offence was robbery.

[15.] I add, simply, that the taking must be *animo furandi*, that is, with a view to steal. Having with care endeavored to lay down the rules and distinctions which seem to me to apply to the case, I proceed to test briefly both the ruling and the declining to rule as requested of the Court, by them. And however he may in some of the numerous points which he was called upon to decide, *seem* to have ruled in conflict with them, yet I think it will be seen that he did in effect administer the law of the case correctly.

[16.] The presiding Judge was requested to charge, that if a charge was made of a crime, and the property alleged to have been stolen, was given up on consideration not to prosecute, that will not amount to robbery, by putting the accused in fear of a charge of an unnatural crime. He had been previously requested to charge that to constitute robbery, the party must be put in fear of some personal or bodily violence or injury, or *in fear*, *by threats of a charge to prosecute for an unnatural crime.* He declined to instruct as asked in the former request, and according to the latter clause, in the last request; saying that there was no evidence about an unnatural crime, and therefore, that matter had nothing to do with the case. We hold, that the Court is not bound to give in charge a true principle of law, if it does not grow out of the case made, nor is he bound to instruct in the language of a request, or in immediate response to it, if in substance at any time the instruction desired is given. Nor is the Court bound to charge an isolated principle which is pertinent and true, when it is presented thus isolated, and its being given singly, would in his judgment mislead the Jury as to the true legal merits of the cause.

[17.] Nor is he bound to charge a mixed proposition, if part is relevant and part is irrelevant, even although each part may be singly true. It is his duty to instruct as to the law in its application to the case made, and the whole case. He did charge the Jury that if the property was given up solely from the fear of a criminal prosecution and its consequences, the offence was not robbery. This would seem to be going even farther than defendant's counsel asked him to go. They admit that a threat

to prosecute for an unnatural crime, would make a case of robbery. The generality of the Court's instructions denies even that, for he speaks of *a criminal* prosecution, and might be construed to mean all criminal prosecutions. The Court explained, however, and said that he would not instruct in reference to an unnatural crime, because there was no evidence in the case referring at all to that. This is true, and instruction as to that was not necessary. It is true, that if *a charge* (that is, any charge) is made, and the property given up in consideration of an undertaking not to prosecute, it does not amount to a threat to prosecute for an *unnatural* crime. But what had this to do with the case? Just nothing at all ; for although there were threats to prosecute for stealing the buggy wheels proven, and although there is evidence of a promise not to prosecute, yet the charge in the indictment of robbery is predicated not on taking buggy wheels, but a negro girl, a wagon, a set of blacksmith's tools, and twenty-five bushels of corn ; and the proof is that these were delivered to the defendants. Now, to have entertained the proposition in the request in the form stated, would have been to entertain a proposition apart from the case, and would have been calculated to mislead the Jury. It is charged that the Court erred in not giving in charge the following, to wit: " that if the prosecutor was guilty of stealing the property of the prisoner, and he caught him with it in possession, he had a right to way-lay and arrest him, and take him before a Magistrate ; and if after the arrest, the posecutor agreed to give up the property to settle the case and stop the prosecution, and gave up the property accordingly, it will not be robbery." This proposition does not grow out of the case. · The Court remarked, in declining this request, that " there was no evidence in reference to the prosecutor being taken before a Magistrate." This is true, but there is evidence that Long *threatened* to take him before a Magistrate. But this request assumes that the case it puts, is the case made, and the assumption is not true. It would have been pertinent, if the property of which the prosecutor is charged to have been robbed, was the property which he was charged with stealing, and if after threats

to prosecute, *it* had been given up upon an agreement to forbear to prosecute. But such is not the case in the pleadings or the proof. The buggy wheels really have little to do with this case. The robbery was not charged to be of buggy wheels, nor so proven. And the presiding Judge is in nothing in this case so much to be commended, as in the steadiness with which he refused to be led off in a false direction as touching the larceny by the prosecutor, of these same buggy wheels, by able and zealous counsel.

He was requested to charge "that to maintain this indictment, the State must prove a *larceny*, and prove it to have been committed under the circumstances which, together with it, constitute the offence of robbery," and it is alleged that he did not so charge. True, he did not, in the terms of the request, but did in substance; saying to the Jury, "that the distinction between *larceny* and *robbery* was this: in the first, the property is taken privately, and without the knowledge of the owner; in the other, forcibly, with his knowledge, but against his will. In other respects the two offences agree." Whether this be the law, as understood by counsel making the request or not, yet we think it is *the law*. Again, the Court was requested to charge "that if the Jury believe from the evidence that the defendants did not intend to steal the property, then it is not robbery," and is complained of as not charging it. In response he said, "that in this case the other ingredients constituting *robbery* being proven to their satisfaction—if they were satisfied as to them, the intention to steal would be manifest by the appropriation of the goods by the defendant—his taking and carrying them off as his own." That is to say, the robbery being made out by proof of a taking by force or intimidation, (the great ingredients of robbery) the *animus furandi*, is to be inferred from the appropriation. This was clearly right.

Again, he was requested to charge, "that the bill of sale, if procured by force, is of no value, and therefore signing that, did not constitute robbery; that the violence or force, must exist and operate at the time the property is taken." The Court charged the first member of this request as to the validity

of the bill of sale, and proceeded to say, "that if they believed this bill of sale was extorted by force or intimidation at the time it was signed, and afterwards the same night, though four or five miles distant, the force or intimidation still continuing, and the prosecutor still operated upon by it, gave up the negro; all taken together, it amounts to one transaction, and is robbery." In a previous part of this opinion, I have laid down these propositions, thus stated by the Court, in substance, as sound law in reference to robbery, and shall not remark upon them farther. After noticing all the requests to charge, the presiding Judge instructed the Jury farther in these words : "If you believe from the testimony, that the prosecutor gave up his property solely from the fear of a criminal prosecution and its consequences, it amounts in law to extortion by duress, or at farthest, compounding a felony.    But if you believe from the testimony, that the defendant Long, together with Dishough and others, knowing that the prosecutor had taken the buggy wheels, (whether he stole them or not, is in the judgment of the Court, immaterial,) entered into a conspiracy to plunder him of his property, and in pursuance of such conspiracy, instead of taking out a warrant against him, induced him in the dead hour of the night to return the wheels to a particular place, and there lying in wait for him, did rush out upon him with cries of, don't shoot, boys, and threats to shoot, seize him and hold him, and extort from him, through fear of personal violence, terror and alarm, produced by the surrounding circumstances united, and in addition to the threats to prosecute and send him to the Penitentiary, his wagon and the bill of sale on the ground and the negro, the same night, the defendant Long and another still accompanying him for the purpose, and run off the negro the next day to parts unknown—the defendant is guilty of robbery, and it is the duty so to find him."    There is some incoherence in this charge thus taken from the bill, because, no doubt, imperfectly taken down. To it the defendant· excepted generally, but the assignment limits it thus, "that the Court erred in the conclusion of the charge to the Jury, by saying to them that if they believed from the testimony an assumed state of facts, to some of which there

was no proof, and especially of unqualified threats to shoot, and upon others, it being contradictory, the defendant is guilty of robbery, and it is the duty of the Jury so to find him." Conceding then, as this assignment does, that in the concluding part of the charge, the Court did not err as to the law, it asserts error in this, that it was founded on an assumed state of facts—to some of which there was no proof, and especially as to unqualified threats to shoot—and as to other assumed facts, the proof was contradictory. If it is true that any of the facts referred to by the Court, are not directly and unequivocally proved, but concerning which there is in the record contradictory proofs, yet it was competent for the Court to refer to them in his instructions, leaving the Jury to determine as he did, whether the facts were proven or not. The conclusion to which he arrives, is depend · ant upon the finding of the Jury. The charge is hypothetical. He tells them, *if they believe from the testimony*, so and so, then the defendant is guilty of robbery. So far as relate to facts upon which the evidence is contradictory, it was competent for the Court to refer to them, leaving the Jury to settle the question whether they are proven or not. We do not think that there is reference made to a single fact in the charge of the Court, in regard to which there is no evidence. Not one. The state of facts presented, is such as the testimony exhibits. There is evidence that Long and Dishough and others knew that Braswell had taken the buggy wheels—that they combined to plunder him of his property. There is *no* evidence that they took him before a Magistrate upon a warrant. There is evidence that he was induced to carry the buggy wheels to a particular place at the dead hour of night; that they did lie in wait for him, and did rush out upon him with cries of "don't shoot, boys;" did seize and hold him, and did threaten to shoot him; that a bill of sale for the negro woman was brought to him and signed upon the ground; that he was threatened with a prosecution and the penitentiary; that Long and another went with him the same night to his house, and that the negro woman was there, and there delivered to Long, and that he carried her off. In relation to the threat to shoot, which the assignment specifies as a

fact not proven, it is proven to have been made. The prose-
cutor swears that Cruse said, "if you attempt to escape, I will
blow a ball through you," and that afterwards Long said, "God
damn you, if you attempt to escape, I will kill you." These
threats were made whilst he was held. After they let him go,
Long again threatened to kill him if he attempted to escape.
Stress seems to be laid upon the threat being qualified. *If you
attempt to escape*, then, said they, I will blow a ball through you,
or I will kill you. Why, the very object of the threat was to de-
tain, alarm and coerce him. In the light of the law, the quali-
fication means nothing. It was *intimidation*, with or without the
qualification. But the only question as to this assignment is,
was there evidence of a threat to shoot? There was, and the
Court did not assume it. And whether, in the execution of the
bill of sale, and the delivery of the property, Braswell was influ-
enced by fear of bodily injury, the Court leaves for the deter-
mination of the Jury, upon their own estimate of the facts. For
it is upon their belief from the testimony that he was so influ-
enced, that he instructs them to find Long guilty of robbery.
So we cannot sustain this assignment.

The evidence to show what Dishough did with the negro wo-
man, has very little to do with Long's guilt or innocence. As
Dishough was implicated in a common purpose with Long, to
take the prosecutor's property, his receiving the slave from Long
and carrying her off, may be considered as bearing remotely up-
on the charge of robbery, by showing the appropriation by both
of them, and on that account correctly admitted. Proof of
Bolls' indebtedness, who was the original owner of the buggy
wheels, was very slightly relevant. There was some evidence
that Braswell bought them of him, and his embarrassed condition
would seem to fortify that idea, by the usual necessity which
such a condition creates of disposing of property. It is true,
that the conclusive weight of the testimony is that Braswell stole
them. Proof of Bolls' insolvency could not injure the defendant,
and we shall not send the case back upon a doubt of its rele-
vancy.

Smith's testimony as to Braswell's appearance at the *Moun-*

Long *vs.* The State.

*tain* some days after the robbery, stands pretty much upon the same footing. At the time when the assault was committed and the property given up, threats were made of a prosecution, and a requirement farther that Braswell should leave the State. His condition at the *Mountain* a few days after the affair transpired, as an alarmed and flying man, was corroborative of this requirement being made, and thereby confirmatory of the whole scheme of plunder.

[18.] It is assigned for error, that when the Court instructed the Jury, according to the requests of counsel, he did it without any exposition of the principle to the Jury, and without any application of it to the facts. The fact was that he read the request distinctly to the Jury, and said to them, *that is the law.* It is proper that instructions should be given in such way as that *the Jury should understand the Court.* There can be no rule but this. When this is done, no error can be committed. And when a proposition is distinctly read to the Jury, and they are informed that it is the law, we cannot assume that the proposition is not understood by them. The contrary is the inference. At the same time, no one need be informed that in presenting a legal proposition to the minds of unprofessional men, the utmost plainness and painstaking in its elucidation are desirable, and for the most part necessary; and the obligation of the Court is not fully discharged unless its application to the case is clearly made. But it is to be noted that in this case, requests were made by able counsel, in all conceivable forms, and that besides the responses which were made to them directly, the presiding Judge gave the Jury instructions at large. It is therefore fairly to be presumed (and we think is true) that in all that was said and done by the Court, all the points ruled, received a fair exposition. Very different is this case from the one referred to, to sustain this exception. In that case, counsel from his seat made a request to the Court, and the Court simply replied to the counsel, *well, I charge it. Colquitt vs. Thomas et. al.* 8 *Geo.* 268.

[19.] That was error—this is not. Counsel for the defendant requested, before the concluding argument to the Jury on their part was begun, and whilst the argument for the State was in

VOL. XII 42

progress, to be furnished with the authorities relied upon by the State, and the Court replied, "you shall be furnished with them before your concluding counsel commences his argument, and they shall be read too, if you desire to consume another hour of the time of the Court." It is not assumed that any right was denied, but the exception is, that the remarks of the Court, made in the hearing of the Jury were erroneous, because calculated to prejudice the defendant's cause. Not necessarily, and therefore not error. The remark of the Court which invoked the exception, that defendant's counsel should have the authorities read too, if they desired to consume another hour of the time of the Court, was not an expression of opinion on the facts, nor did it intimate a censure upon the defendant, or relate directly or indirectly to his guilt or innocence. We presume not to prescribe the manner of intercourse between the Court and the Bar. We leave that to the good sense and high breeding which so very generally characterise both, except where we find that it affects the rights of parties; then it is within our corrective jurisdiction.

[20.] During the concluding argument for the State, counsel for the defendant called the counsel for the prosecution to order, alleging that he misrepresented the testimony of the witness Johnson, and asked the Court to correct him by calling the witness back, who was present, or by referring to the brief of the testimony taken down upon the trial. The Court directed the counsel for the defendant to take his seat, saying that his notes were a mere private memorandum that he was required to keep, and that the Jury would decide. This is assigned for error. Now, it does not seem, from the history of this passage, briefly detailed in the bill as above, that the Court denied the right of defendant's counsel to correct the counsel for the State. He did in fact rise in his place and correct him. Nor did the Court affirm that the one or the other was right in his recollection of the testimony. He expressed no opinion, but said the Jury would decide. The ultimate decision as to what is proven, is the province of the Jury. Yet it is certainly the business of the Court, when practicable, to correct the misrepresentations of the

testimony by counsel, particularly when that counsel is in con-
clusion. And it is practicable, when the witness whose evidence
is charged to be misrepresented, is in Court. He ought to be
called to say what he did testify. And it is practicable in cases
in which, like this, the law requires the testimony to be taken
down, by reference to the brief. We differ with the Judge in
his opinion, that the brief of the testimony taken down in cases
of felony, is but a memerondum for his private use. It is taken
for the use of the reprieving and pardoning power, primarily no
doubt; and we see no objection, where the witness is not at
hand, to its being used to correct a misrepresentation on the argu-
ment. Its verity is presumed, because it is taken under as seri-
ous sanctions as any act is done by the Court or its authority in
the progress of the trial. It is made the duty of the Judge to
take or cause it to be taken down, and in the event of a con-
viction and sentence, it is required to be approved by the Court,
and recorded, and upon application for a reprieve or pardon, a
certified copy of it must accompany the application. *Cobb's
New Dig.* 841, 858, 859. We have held it error for counsel,
when objected to, to be allowed to comment upon facts not
proven. (*See a case from Stewart County, tried before this Court
at Americus in July last, vol.* 11, *page* 615.) This is not exactly
a case like that. There, the facts were not claimed to have been
proven; whilst here, the controversy was as to what a witness
*who was sworn,* had testified. There the Jury could not judge
between the parties; the facts improperly commented upon not
being in any form before them; here they can decide, because
there was evidence on the subject-matter about which counsel
disagreed. Under all these views, we will not say that the re-
fusal of the Court to have the testimony of Mr. Johnson set
right, either by calling back the witness, or by refering to the
brief, was error; but we do say it was an irregularity. And the
same may be said of the exception founded on the refusal of
the Court, under the circumstances, to hear argument in favor of
the motion to arrest the judgment and the rule for a new trial.

It is claimed in the motion for a new trial, that the verdict
was contrary to law and evidence, and the Court is charged in

the bill to have erred in not granting it on these grounds. From what has been already said about the law of the case, it is, I hope, clear, that the verdict was not against law. Of course we will not disturb a verdict on the facts supported by the evidence, as this is. The rule is, if there is evidence to support the verdict, it stands, so far as this Court is concerned. That there was evidence going to show that this defendant was guilty, is too obvious to require a single word.

[21.] In prosecutions for robbery, we hold that the person robbed is competent to prove that at the time of the robbery he was scared. He can speak to a matter of his own consciousness and experience. Why not as well as to a fact which he knows through the sense of seeing, or hearing, or feeling? The testimony of Braswell to the fact of his "being scared," was properly admitted.

Let the judgment be affirmed.