### 5853.   BOWEN *v.* THE STATE.

1. To constitute robbery by force, it is not essential that the victim shall be conscious. While it is not robbery to abstract property furtively from the person of one who is unconscious, that offense is committed where, to accomplish the taking, he is beaten or bodily injury is inflicted upon him.

(a) What was said in the decision in the case of *Williams* v. *State,* 9 *Ga. App.* 170 (70 S. E. 890), to the effect that it must be shown that the victim was conscious of the taking, was not intended to apply to robbery by force (in the sense in which the term "force" is used in the law as to robbery), but related to a kind of robbery in which such force is not essential, and which the act of 1903, amending the code definition of robbery, added as an offense distinct from robbery by force and robbery by intimidation, to wit, "the sudden snatching, taking, or carrying

away" of property, "without the consent of the owner or person in possession or control thereof." Penal Code, § 148.

2. The force which distinguishes robbery from larceny from the person, where the property is taken without the knowledge of the owner, may be no more than is used to break a watch-chain, in detaching a watch from the person.

3. The evidence was sufficient to show that the prosecutor's watch, money, and other things of value, of which the indictment alleged he had been robbed by force, were taken from his person while he was drunk or unconscious from liquor furnished to him by the defendant, which probably was drugged, and that his watch-chain was broken and bodily injuries were inflicted upon him while he was in that condition; and the circumstances authorized the jury to conclude that the watch-chain was broken and the injuries were inflicted in the taking of these things from his person, and that the defendant was the perpetrator of the crime.

DECIDED MARCH 18, 1915.

Indictment for robbery; from Fulton superior court—Judge B. H. Hill. May 30, 1914.

*Moore & Moore, Sims & Von Nunes,* for plaintiff in error.

*Hugh M. Dorsey, solicitor-general,* contra.

WADE, J. Tom Bowen was convicted under an indictment charging him with robbery by force, alleged to have been committed in taking a watch and certain other property from the person of J. A. Rozier. From the testimony for the State it appeared, that between 1 and 2 o'clock at night, on December 27, 1913, Rozier engaged the defendant (who was a cab-driver) to drive him in cab No. 89 from a club on Marietta street, in the city of Atlanta, to the Brittain Hotel, and directed him to go by a store owned by Rozier and his brother. At the store Rozier opened the door and invited the defendant to come in, as the night was very cold, and in his presence opened a safe and took from it ten one-dollar bills. Thereafter Rozier re-entered the cab and instructed the defendant to take him to a house on Edgewood avenue, which he entered, and after a minute or two he returned to the street, got into the cab, and requested the defendant to drive to "the hotel." The cab was driven up Edgewood avenue and Marietta street to Broad street, and out Broad street to Alabama street, and there it stopped, and the defendant turned to Rozier, who was then considerably under the influence of liquor, and said, "It was a little bit dangerous for me to drive over this way, I have been having some trouble over here." Rozier replied, "I don't reckon there is any harm in it," but

the defendant said it was getting late in the morning. Just then a policeman came up and spoke to the defendant, but Rozier did not hear what was said, and the defendant turned the cab around and said, "I told you we would get into trouble if we didn't mind," and suggested pulling down the shades in the cab, so that no one could see who was inside, and that they "drive around another way." Rozier agreed to this, the defendant pulled down the shades, and the cab resumed its journey. Rozier failed to look out of the windows or pay any attention to the direction in which they were going. The cab finally stopped, the driver jumped out, and Rozier opened the door, and, failing to recognize the locality, inquired where the defendant was going. The defendant replied that he was going "into this house a minute," and would be "right back." Rozier said, "All right, hurry back," and sat down again in the cab, but after ten or fifteen minutes he grew tired of waiting; it was very cold, and he got out of the cab and went to the house, and entered without knocking. The defendant was sitting by the fire, and, in reply to Rozier's question why he did not come on, he said he was just getting ready to come. The defendant asked Rozier if he would not like to have a half-pint of whisky before leaving, and, when Rozier answered "Yes" and gave him a half-dollar, the defendant handed Rozier a half-pint bottle of some kind of liquid. Rozier, thinking it was whisky, took a drink from the bottle, gave the bottle back to the defendant, and went out with him and got in the cab. The defendant then said he had forgotten something, and went again into the house, with the statement that he would "be right back." Rozier began feeling the effects of the drink he had taken from the bottle, which he said made him dizzy when he took it, and "went all through" him, and was "nothing like an ordinary drink of whisky," and, suspecting that something was wrong, he took out a diamond stud that he wore, and put it under the lapel of his coat, and in a few minutes became unconscious. He testified that he had been drinking before he took this drink but was not drunk, and that after he became unconscious he knew no more until the following night, when he recognized his brother leaning over him at Grady Hospital, asking him to tell who was with him "that night." His diamond stud, watch and chain, overcoat, masonic pin, and the contents of his pockets were taken from him after he drank the liquor and became unconscious.

The doctor on duty at the Grady Hospital at the time Rozier was brought there testified, that he "was in such condition his own brother could not recognize him; his face was beaten to a jelly, his jaw was broken and nose broken, chin cut, several cuts on his face, eye knocked out;" that he seemed to have been beaten with some blunt instrument, and that the beating could have been done with an instrument similar to one exhibited at the trial; that it was necessary for him to remain in the hospital a month or six weeks; that in response to questions before he was able to talk, he wrote the cab number—89—on a piece of paper, the name of the club, and the time at which he left the club—1:30; that his condition was desperate and he was unconscious when he was brought to the hospital, but when he wrote the cab number, etc., "he knew what he was talking about;" that the writing was done "Sunday afternoon after he was injured Friday night;" that he said the driver promised to take him to a "sporting house," but he never reached it. Policeman Hannah testified, that he saw Rozier "on the night of December 27, 1913, about 5 o'clock in the morning;" that a colored woman came by on his beat and reported that some one was lying down in an alley, "moaning and going on;" that he went down to the alley, back of Gilmer street, and found a man beaten up worse than he had ever seen anybody; that he could not recognize him at all, or tell whether he was white or black; that he called the patrol wagon and sent the man to the Grady Hospital. The witness said further he had known Tom Bowen, the defendant, for several years and had seen him at 2 o'clock the same morning; that the police examine cabs that go over their beats after 12 o'clock; that Tom Bowen's number was 89, and that he came into Decatur street from Fort street, about two blocks away from where Rozier was found later. This witness said that Rozier was covered with blood and was unable to talk, and "there was a little piece of watch-chain hanging on to his vest, about as long as your finger. His overcoat was gone. I saw that piece of wood down there. After I sent him in I went back to search, and I found a pool of blood right in the mouth of the alley, and this was lying right by it, and I found where it had been pulled off the fence, about ten feet from where I found Mr. Rozier." The witness said, on cross-examination, that he was on duty from 12 o'clock to 8:30; that he found Rozier in the alley or back yard of a place on Fifth avenue,

8

"a little over a block from Decatur street, and about as far from Gilmer street, across the street right at Gilmer street;" that Fifth avenue is a little alley running from Fort street, and Rozier was lying in the alley or back yard; that blood and bloody tracks were all about there, and blood "seemed to have been scattered all over everything when he was beaten up, and must have got on the man who beat him up too;" that he saw cab 89 going in about 2 o'clock "at Decatur and Fort streets," and at that time there was nobody in the cab, and the driver, Tom, was by himself; that the body was found about two blocks "this side" of where he saw the cab—the cab was two blocks beyond."

Policeman Clack testified as follows: "I remember the night Mr. Rozier was assaulted. I saw him in the cab that night about 2 or little after 2 o'clock at Broad and Alabama streets, in Tom Bowen's cab, No. 89. I am positive it was Tom Bowen; I don't know how long I have known him. There was a man in the cab at the time, but I didn't know it was Mr. Rozier. He drove the cab up and straight across the sidewalk at Broad and Alabama, and I never said anything to him. I stopped there a moment. I never said anything to him. I walked on to Mitchell street and came back, and he was still standing there. I says, 'Drive on somewhere;' and he turned around and drove back across the viaduct. Mr. Rozier was in cab 89 at Broad and Alabama streets at 2 o'clock or a little after. I took the driver to be Tom Bowen." It will be observed that this witness first stated that he saw Rozier in Tom Bowen's cab, No. 89, about 2 o'clock at Broad and Alabama streets, and also stated that there "was a man in the cab at the time, but he didn't know it was Mr. Rozier;" and on cross-examination he said: "Mr. Rozier was in cab 89 at Broad and Alabama streets at 2 o'clock or a little after." Evidently the witness meant by this testimony that when he saw Rozier in the cab he did not know who he was—that is, did not know his name, but he recognized the prosecutor, Rozier, as the same man, and then testified the man he had seen in the cab was Rozier. There was further evidence that 89 was the number of Tom Bowen's cab, and evidence that Rozier, after his discharge from the hospital, went with certain policemen to the place where he was found, and entered three or four houses near that point, some of which were exactly alike, and finally identified, without aid, the house where he obtained the

drink from Bowen, and this house proved to be Bowen's house on Gilmer street, about a block from Fifth avenue, where the witness Hannah said he saw the defendant on that night; that after the identification of the house by Rozier, he went to the jail and immediately identified Tom Bowen as the negro who was with him on the night he was robbed, and as the last man he had spoken to then. It further appeared that the defendant on several occasions made conflicting statements as to his movements at or about the time the robbery occurred. None of the stolen property was found in his possession, and none was recovered except the diamond stickpin, which was found in the possession of a negro orderly at the hospital, who had waited on Rozier. The piece of wood picked up near where Rozier was found was introduced in evidence. There was testimony for the defendant from his mother, his brother, and his sister-in-law (who lived in the same house with him) to the effect that he did not come home between midnight and the morning of December 27, 1913. His mother and his sister-in-law testified that they did not see Rozier there that morning; the defendant's brother did not say whether he saw Rozier. The sister-in-law testified that there were three rooms in the house, that she slept in the middle room, that there was fire in the front room, and that she did not sit up all night. There was testimony from another witness, tending to prove an alibi, and the defendant made a rambling statement, in which he recounted what he understood Rozier had stated in regard to his movements on the night in question, and finally, when by permission of the court his attention was directed to his own movements, he told what trips were made in his cab and where he had gone, but he nowhere mentioned that he had driven Rozier to any place whatever, nor did he deny in so many words any statement made by Rozier or by any other witness for the State.

The motion for a new trial is based on the general grounds only, and it is insisted by the plaintiff in error that the verdict finding him guilty of robbery was unauthorized because the testimony for the State showed that the property was taken without the knowledge of the owner and while he was unconscious, and therefore that the offense was larceny from the person and not robbery. Prior to 1903 our code (Penal Code of 1895, § 151) defined robbery as "the wrongful, fraudulent and violent taking of money, goods or

chattels from the person of another by force or intimidation, without the consent of the owner." In 1903 the definition of robbery was amended by adding the following: "or the sudden snatching, taking, or carrying away any money, goods, chattels, or anything of value from the owner or person in possession or control thereof, without the consent of the owner or person in possession or control thereof." In *Williams* v. *State, 9 Ga. App.* 170 (70 S. E. 890), Judge Russell, speaking for the court, said: "Under the act of 1903 (Acts 1903, p. 43) amending the former definition of robbery, there was added to robbery by force and robbery by intimidation a new class or kind of robbery, to wit, 'the sudden snatching, taking, or carrying away' of property, 'without the consent of the owner or person in possession or control thereof.' Penal Code (1910), § 148. Prior to this amendment violence of some kind was an indispensable essential of the offense of robbery. Without violence there could be no robbery; but the offense might be larceny from the person. Since the amendment, in order to prove a case of robbery by suddenly taking or carrying away the property of another without his consent, it is only necessary to show that the person robbed was conscious that something was being taken away from him, and that for any reason he was unable to prevent it; and consequently the only difference now between robbery of this class and larceny from the person is that in the latter case the property is abstracted without the knowledge of its possessor; but if the possessor becomes conscious, even in the taking, that his property is being taken away from him, and this knowledge is obtained before the taking is complete, the offense of robbery is committed." That case is relied upon by the plaintiff in error as authority for the position that since the evidence disclosed that the person robbed was at the time of the taking unconscious that his property was being taken from him, a conviction of robbery could not be sustained. It will be observed that the holding of the court that in order to convict, it was "necessary to show that the person robbed was conscious that something was being taken away from him, and that for any reason he was unable to prevent it," applies distinctly and plainly to the "new class or kind of robbery" referred to in the amendment of 1903.

Under the common law, and under the decisions of our Supreme Court relative to robbery by force or intimidation, it is not essen-

tial that the person robbed should be conscious at the time the robbery is committed that something is being taken away from him. In Blackstone's Commentaries (vol. 4, p. 196) it is said: "Lastly, the taking must be by force, or a previous putting in fear; which makes the violation of the person more atrocious than privately stealing. . . This previous violence, or putting in fear, is the criterion that distinguishes robbery from other larcenies. . . Not that it is indeed necessary, though usual, to lay in the indictment that the robbery was committed by *putting in fear;* it is sufficient, if laid to be done by *violence.* . . Thus, if a man be knocked down without previous warning, and stripped of his property while senseless, though strictly he can not be said to be *put in fear,* yet this is undoubtedly a robbery." "When a robber has disabled his victim, a taking then from the person with no further violence suffices." 2 Bishop's New Criminal Law, § 1168 (1). In 24 Am. & Eng. Enc. of Law (2d ed.), 1002, it is said: "While it is not robbery to abstract money from the person of one drunk and unconscious, it is otherwise if, to accomplish the taking, the intoxicated person is beaten and bruised." "Where the prosecutor's watch was fastened to a steel chain, which went around his neck, the seal and chain hanging from his fob, but the steel chain still secured it; upon which the prisoner, by two jerks, broke the steel chain, and made off with the watch; the judges were unanimous that this was a robbery, as the prisoner did not get the watch at once, *but had to overcome the resistance made by the steel chain, and used actual force for that purpose"* (italics ours). 2 Russell on Crimes, 1135. "The mere snatching of an article from the person of another, without violence or putting in fear, is not robbery, except where there is some injury or violence to the person of the owner, or where the property snatched is so attached to the person or clothes of the owner as to afford resistance." 34 Cyc. 1800. This statement is modified in Georgia by the amendment of 1903, supra. "To show that force and violence were used, the extent of the injuries inflicted on the person robbed may be proved." Id. 1807. "It avails the accused nothing if the person robbed makes no resistance, or is even unconscious at the time that a robbery is being perpetrated. The victim of a sand-bag may be stripped while unconscious from the blow. It is not necessary to show a suggestion of force or violence on the part of the person

robbed. The force which differentiates robbery from larceny from the person is the force employed by *the criminal* (italics ours). It is the act which is supposed to evidence a bolder lawbreaker than a sneak thief. . . While in the present case there was no struggle, there was personal violence and a personal outrage, within the meaning of the law. It is true that resistance by the person robbed has been said to be one of the decisive tests distinguishing robbery from larceny from the person. See *Spencer* v. *State,* 106 *Ga.* 695, and cit. But *this test* seems to have been applied *in only those cases* where the person was deprived of his property *by snatching"* (italics ours). *Moran* v. *State,* 125 *Ga.* 33, 34, 35 (53 S. E. 806).

In *Smith* v. *State,* 117 *Ga.* 320 (43 S. E. 736, 97 Am. St. R. 165), it was held: "Where a purse secured by a steel chain wrapped around the owner's finger is suddenly snatched by one intending to steal the same, and the force used is sufficient to break the chain and injure the owner's finger, the offense is robbery, and not larceny. from the person." In the opinion delivered by Justice Lamar in that case it was said: "The evidence shows that the article was so attached as to afford considerable resistance; the violence necessary to secure the purse was sufficient to break a steel chain, and inflicted injury on the person robbed. Here there was open force and violence, resistance by the owner, and injury to the person; so that it could not have been merely larceny from the person, but was robbery." The ruling in that case was made before the passage of the amendment of 1903, making "snatching" robbery under certain circumstances. In *Long* v. *State,* 12 *Ga.* 293 (9), it was said: "Actual *force,* in our definition of robbery, implies personal violence. If there is any injury done to the person, or if there is a struggle to retain possession of the property, before it is taken, it is the force of our Penal Code." In *Pride* v. *State,* 125 *Ga.* 748 (54 S. E. 686), the Supreme Court said: "The offense of robbery, as defined in section 151 as amended [Penal Code of 1910, § 148], consists in the wrongful, fraudulent, and violent taking of money, etc., from the person of another, whether such a taking be accomplished by force, intimidation, or the sudden snatching without the consent of the owner or person in possession. . . The sudden snatching from the victim *with his knowledge* (italics ours) is violence in the sense of this word as used in the amending act. In

other words, the General Assembly has enlarged the meaning of the words 'open force and violence,' as used in the section of the Penal Code; so that the crime of robbery may now be committed by force exerted directly upon the person robbed, or by suddenly snatching the property from the person, where no other force is used than is necessary for the thief to obtain possession of the property." It may be said in passing, as is remarked in some one of the decisions of the Supreme Court or of this court, in discussing the amendment of 1903, that the enlargement of the definition of robbery made thereby was evidently with the purpose of covering such cases as *Fanning* v. *State,* 66 *Ga.* 167, and *Spencer* v. *State,* 106 *Ga.* 692 (32 S. E. 849).

The accused in this case was charged with robbery, for that, on a day named, "with force and arms [he] did wrongfully, fraudulently, and violently, by force and intimidation, take from the person of J. A. Rozier, without his consent and with intent to steal the same," one open-face gold watch and other property described. It is apparent, then, that the accused was not indicted for the sudden snatching, taking, and carrying away of property declared by the act of 1903 to be robbery, but was indicted under that part of section 148 of the Penal Code (1910) which defines robbery to be the wrongful, fraudulent, and violent taking of money, goods or chattels from the person of another by *force or intimidation.* In *Pride* v. *State,* supra, Justice Evans, speaking for the court, said, that "where the property was suddenly taken by the thief from the owner, who was off his guard, and no force was used by the thief other than that which was necessary in possessing himself of the article taken, he would nevertheless be guilty of robbery, under the provisions of section 148 as amended in 1903, as, since the passage of that amendment, the offense may be committed though no force be exerted beyond the effort of the robber to transfer the property from the owner to his own possession. As already said, this court in *Williams* v. *State,* supra, held that since the amendment of 1903, in order to prove a case of robbery by the sudden taking and carrying away of the property of another, without his consent, it is only necessary to show that the person robbed was conscious that something was being taken from him, and for some reason he was unable to prevent it, and it is said that "the only difference now between robbery of *this class* [by snatching] and

larceny from the person is that in the latter case the property is abstracted without the knowledge of its possessor;" and that should the possessor become conscious of the taking, the act is robbery.

It appears, then, to be well settled that where one is prosecuted for robbery by force, and it appears that the property taken from the person of the victim was attached to his clothes, and in removing it the thief exerted force,—as by breaking a chain connecting the property with the person,—such force is sufficient to make the crime robbery rather than larceny from the person; and this is true even though the victim was drunk or unconscious at the time; and where injury or violence is inflicted upon the person of the owner to effect the taking, it is immaterial, in a prosecution for robbery by force, whether he was conscious of the taking or not. In one case, where a heavy diamond pin, with a corkscrew stalk, which was twisted and strongly fastened in a lady's hair, was snatched out, and part of the hair torn away, the crime was held to be robbery. 1 Leach, 335. In another case one who tore an ear-ring from the ear, and in so doing lacerated the flesh, was found guilty of robbery. 1 Leach, 320. In 24 Am. & Eng. Enc. L. (2d ed.), supra, it is said: "While it is not robbery to abstract money from the person of one drunk or unconscious, it is otherwise if the intoxicated person is beaten and bruised." As was said by Justice Cobb in *Moran* v. *State,* supra, where such force is used, "it avails the accused nothing if the person robbed makes no resistance, or is even unconscious at the time that a robbery is being perpetrated." While the evidence in this case discloses that the person robbed became unconscious, so far as he was able to assert, before any violence was done to his person and before any of his property was removed therefrom, it further appears that when he was discovered by the policeman some hours later, he had been terribly beaten, his jaw broken, one eye destroyed, and his watch and other property gone, and that there was still attached to his person a small remnant of his watch-chain, from which his watch had been broken off. The presence of the piece of broken watch-chain, together with the physical injuries inflicted upon his person, was sufficient, under the well-recognized rules referred to above, to authorize the jury to conclude that force had been used in depriving the injured man of his property, and especially in detaching or tearing away from his person his watch. The force exerted by the robber in

jerking the watch from the pocket of his victim, and the resistance afforded by the chain which attached the watch to his person, constituted technically all the force and resistance necessary to support a charge of robbery. Again, the jury were authorized to conclude that the terrible injuries inflicted upon the person of the owner of the property indicated active resistance on his part, and the use of force on the part of the accused in removing the property from his person, even though the resistance may have been blindly offered and the force exercised against a man practically unconscious from drink or drugs, who was unable to recall the facts when finally restored to reason. The jury had a right to consider all the proved facts and circumstances in determining whether force was used by the accused in taking the stolen watch from the person of Rozier, and in this connection doubtless considered the evidence showing that he had been badly beaten and bruised, when discovered soon after the commission of the crime. The evidence was ample to sustain the verdict, and the trial judge did not err in overruling the motion for a new trial.

*Judgment affirmed. Broyles, J., not presiding.*