The evidence sustains the verdict.
 DECIDED DECEMBER 5, 1945.
The plaintiff in error, whom we shall call the defendant, was indicted for robbery and convicted of an attempt to commit robbery. He excepts to the overruling of his motion for new trial, which contains only the general grounds.
The evidence for the State is substantially as follows: The prosecutor, Mr. Smith, testified: That between 8 and 9 o'clock at night he parked his car on Peachtree Street. From there he went across the street to a liquor store and made a purchase. He then returned to his car where he saw the defendant and a soldier. They requested him to open a bottle of wine which they had. He informed them that he had nothing to open it with. He [the defendant] then requested the witness to take them to an eating place in the next block. The soldier had a barracks bag and put it in the car. The three of them, riding on the front seat of the car, proceeded to the eating place, which was about two blocks away, instead of one block, but still on Peachtree Street. When they arrived at the eating place, where the witness was directed to stop, the defendant and the soldier invited the witness to go in with them. The three went into the place together. The soldier went on to the back, apparently to the rest room. The bottle of wine was given to the proprietor by the defendant. While the defendant's attention was on the opening of the bottle of wine, the witness went out of the eating place, going to his car, for the purpose of leaving the other two. The car was almost in front of the door. When the defendant saw the witness leaving the front door, he followed the witness and wanted to know of the witness where he was going. The witness endeavored to pass it off with the remark that he was trying to see if his car was locked, whereupon the defendant stated, "You are coming back in here and drink with us." The witness did not argue with the defendant and they started back into the eating place, and when they approached about to the door the defendant remarked "We are going to leave this soldier." In the meantime the witness was insisting that he had to go, since he *Page 285 
was in a hurry and didn't have time. The defendant insisted that the witness go back into the eating place and take a drink, and as the defendant got to the door the defendant said, "We are going to leave this soldier." At this time the soldier had not returned from the rear of the eating place. As the witness and the defendant left the place to go to the car, the defendant was back of the witness, and the defendant said: "Get in and drive. You know what I mean." At the time the defendant made this remark to the witness, the defendant had his hands in his overcoat pocket and something seemed to be slanting toward the witness and part of the time pointed toward him, and the defendant said, "Get in and drive." At the time the defendant made this last remark, the witness was on the right-hand side of the car, away from the steering wheel. The witness opened the car door and got in, "because I was afraid he meant it — for me to get in and drive, and that's the reason I got in. I was scared because he gave me orders, and I was afraid he might shoot." When the witness got in the car and slipped in over to the steering wheel, the defendant told him to drive and turn the first street. The defendant was in the car at the time — in the front seat with the witness, who instructed him to drive on Currier Street on the corner. The witness drove the car down Currier Street because he was directed to do so by the defendant. They drove two blocks down that street, whereupon the defendant remarked to the witness, "not to be nervous, that he was not going to hurt the witness if he did like [what] he told the witness to do." After driving down two streets, the defendant instructed the witness to turn to the left, which the witness did. This put the car in the wrong direction, on a one-way street. The witness drove one or two blocks and voluntarily turned left again, and went over there to Peachtree Street. The defendant said that he wanted to go out Ponce de Leon Avenue, so the witness turned the car north, but the defendant did not give any instructions to turn into Ponce de Leon Avenue when they arrived there, and the witness drove the car on past the Fox Theater. At this point a street car was in front of the automobile, unloading passengers. The witness testified: "I thought that was my chance, and I slid out. I choked the car down behind the street car and rolled out, and after that I felt that was my chance to get me out of my car and get my car back. I went back at him but he got loose. I caught *Page 286 
hold of him and he commenced getting out and got out on the right-hand side and ran. He broke loose from me and after he got out I caught him and he broke loose from me again. We came down Peachtree to Ponce de Leon and he turned right." The defendant lost his hat. The officer arrived at the scene pretty soon. The defendant had fled. The defendant told the witness on the road from the eating place to the point where the defendant fled that "he wanted my money and my car . . and that my car would be right back and that it would not be hurt." The place where the defendant told the witness "to keep quiet and not resist him, that all he wanted was my money and my car, was in Fulton County."
On cross-examination, the same witness testified also: That the witness did not see the soldier any more until the detectives went to the eating place; that the defendant "was drinking pretty heavy — it was heavier than I wanted to be with him." It was quite a cold day and the defendant had on his overcoat. The witness did not have on his. There were "a good many people" at the place where the witness choked down his car and at the point where the defendant fled. The crowd was coming out from the first night show of the Fox Theater. The witness made an alarm, and fell out of the car purposely. They had a scuffle in the car before the witness got out. The witness tried to pull the defendant down on the seat. The defendant did not start the car; the motor was not cut off, it was choked down. When the witness returned to his car, the keys were on the floor; he did not know whether the defendant took them out or not. The witness was scared when he got to where he choked the car down, directly behind the street car. He did not know whether he took the keys out of the switch or not, but they were on the floor; the defendant did not have time to pick them up. The witness did not see any pistol or knife or weapon of any kind on the defendant, and the defendant did not make any effort to put his hands on the witness or get his money or watch or anything. After the witness and the defendant were out of the car, the witness caught the defendant but was too far away to hold him. The witness was trying to hold the defendant in the car but the defendant jerked loose. The car did not move by the defendant's efforts.
The witness further testified that he had never seen the defendant *Page 287 
or the soldier before; the defendant wouldn't take a drink with them; the witness was trying to leave them. "I thought I would leave them there and he [the defendant] said, `Come on back in here, and I said [to myself] `I will just wait till I get a better chance.' I admit that I was scared and that is the reason that I rolled out of my car."
The police officer who made the arrest testified that he arrested the defendant on the corner of West Peachtree and Third Streets, two blocks from where the witness was informed that the defendant left the car. The defendant was running when the policeman caught him, and was the only one whom the officers saw running. The witness saw no reason for the defendant to have run. The defendant was taking off his coat while running. His tie was loose. At the time the officers arrested the defendant, they informed him "that he was charged with robbing a man." At first the defendant denied everything, but later, after the defendant was turned over to car number 14, admitted having been with Mr. Smith. The witness went to the place that Mr. Smith described, and heard car number 14 get a lookout for the defendant, who was last seen back of the Fox Theater. The witness was in that territory, drove down West Peachtree Street, got to Third Street, and saw the defendant running down the middle of the street, pulling off his coat, bareheaded, with a loose tie. The officers jumped out of their car and inquired of the defendant, what was the trouble, and the defendant said, "No trouble," and the witness said, "Why are you perspiring?" The defendant said, "Nothing." The arresting officer turned the defendant over to car number 14, which in turn delivered the defendant to the detectives who drove up in the meantime.
On behalf of the defendant, the officer who took charge of the defendant testified: That he saw the soldier who was with the defendant. The soldier was under the influence of some intoxicant, but was not drunk. The defendant was drinking. Mr. Smith was drinking to the extent that it was noticeable, but was apparently in control of his faculties. The witness talked to the soldier in the presence of the defendant. Up until that time the defendant had contended, even after seeing the soldier, that he did not know anything about what had happened, that he recalled no part of it. The soldier in the presence of the defendant related the instances *Page 288 
from the time he and the defendant first saw Smith until they disappeared from the eating place where he was and while he was in the rest room. The defendant made no denial of the statement which the soldier related in his presence. He said that "He didn't know what happened; that he didn't remember about it." The defendant had already been searched, but the witness searched him again and found no weapon on him. The defendant was under the influence of something, but the officer didn't know what it was.
The defendant made the following statement: "Frankly, I really don't know anything about meeting Mr. Smith or the soldier or anyone else for that matter. I left my wife early in the morning. I went by my aunt's house, and after that I don't remember even leaving my wife over at my aunt's. All I remember, I think when I was arrested it was on West Peachtree. One of the officers had me. I don't know who it was. He hit me with a flashlight, and the next thing I knew I was in Grady Hospital, and then I went on to the jail. That's all I know. I was over at the hospital. They carried me to the hospital. I asked a nurse while I was waiting for the doctor, would she mind calling my wife, and telling her that they were going to carry me to the jail. They called my wife and she went to the hospital to see if I was there before coming to the jail. They did call my wife, one of the nurses at the hospital, or that's what my wife told me. She would not have known where I was."
The arresting officer, recalled in rebuttal, testified substantially that no one hit the defendant after he was arrested; that they talked to him, and "he talked normally as he talks now." The witness did not know that the defendant went to the hospital; and, if anything happened to him, it was after the witness turned the defendant over to the other officer.
We have set out the evidence somewhat in detail. We do this for the reason that the only contention on behalf of the defendant is that the evidence does not authorize the verdict of attempt to rob. Several cases are cited by counsel for the defendant to sustain this contention. The State likewise cites a number of cases to sustain the contrary view that the evidence is sufficient to sustain the verdict. Hence, the question before us for decision is *Page 289 
not so much what the law is, but whether the facts above related should cast our decision for a reversal or for an affirmance of the judgment. We shall not enter into any detailed discussion of the cases cited by either side. We shall only cite the cases here and let those who are interested make their own comparisons. The cases cited for the defendant are: Groves v. State, 116 Ga. 516
(42 S.E. 755, 59 L.R.A. 598); Wilburn v. State,22 Ga. App. 613 (97 S.E. 87); Thompson v. State, 52 Ga. App. 355
(183 S.E. 214); Orr v. State, 62 Ga. App. 774
(9 S.E.2d, 917); Burton v. State, 109 Ga. 134
(34 S.E. 286); Brown v. State, 95 Ga. 481 (20 S.E. 495). As we view the facts in the cases cited in comparison with the facts in the instant case, and apply the law which is applicable to the facts in the cases cited as well as the instant case, we conclude that the contentions of the defendant are not tenable.
The State cites the Code, §§ 27-2303, 27-2507; Foster v.State, 70 Ga. App. 305 (28 S.E.2d 81); Green v. State,70 Ga. App. 103 (27 S.E.2d 567); Alexander v. State,66 Ga. App. 708 (19 S.E.2d 353); Hammond v. State, 47 Ga. App. 795
(171 S.E. 559); DeKrasner v. State, 54 Ga. App. 41
(187 S.E. 402); Long v. State, 12 Ga. 293.
In addition, a number of foreign decisions have been called to our attention, which we will not here note. Briefly, it is the contention of counsel for the defendant that the evidence at best discloses, if anything, only preparation to commit a crime, and that it nowhere evidences an overt act toward the offense of attempt to rob. With this view we can not agree. As we see it, the record is replete with overt acts, from which the jury were well authorized to find that the defendant intended to take the prosecutor's car by intimidation at least, and if need be perhaps by actual force.
We think that the jury were authorized: (a) to find that Smith was compelled by the remarks and the conduct of the defendant to drive Smith's car toward a convenient place where the defendant could take it; (b) that he was intercepted and prevented by Smith from carrying this intention into effect; (c) that the defendant expressed this as his purpose, notwithstanding that he stated that he would return the car unharmed; (d) that the defendant's contention that he knew nothing about what happened was a ruse and an afterthought, for (1) the officer said he was normal; (2) and shortly after being placed under arrest he remembered to have his *Page 290 
wife called. In our view, to reverse this case would be but a judicial license for any person to clothe himself with inebriety, either feigned or real, and, with the pretense of a weapon, intimidate an automobile operator to take him in the owner's car, and to compel the operator while thus intimidated to drive the car at the criminal's bidding. Under the evidence in this case, the law does not sanction such. Voluntary drunkenness does not excuse the defendant. He was not too drunk to flee when intercepted and apprehended. The jury were further authorized to infer from the evidence that the defendant could have, in his flight, disposed of a pistol, if he had one; and further that he was not struck by any officer and was not taken to the hospital. The fact that he was struck and the fact that he was carried to the hospital, if true, could have been easily established by the defendant, if material to the case. He introduced, as his own witness, the detective who received him from the custody of the arresting officer, and this detective presumably delivered him to those in charge of the police barracks.
The evidence is fully sufficient to sustain the jury's finding.
Judgment affirmed. Broyles, C. J., and MacIntyre, J.,concur.